The next case on for argument is Bataille and Brenner versus Ferrellgas Partners. Mr. Whitman Good morning, your honors, Johnston Whitman on behalf of the appellants. May it please the court. The core issue before your honors in this appeal is whether the district court erred in determining that it was immaterial to reasonable investors that Bridger secretly agreed at the beginning of 2016 to no longer deliver oil under the Monroe TLA and to take steps to disable itself from being able to make deliveries for the indefinite future by abandoning its separate contract with Eddystone, the transloading facility. Defendants consistently represented that the Monroe TLA was the company's most important and largest revenue-generating contract. And for that very reason, the first question asked during the June 8, 2016 conference call by a securities analyst was about the amount of oil currently being delivered to Monroe and the prospects, the outlook for future deliveries to Monroe. In response to this analyst's question, defendant Rios misleadingly represented that Bridger was continuing to deliver oil to Monroe, but he declined to deny it. But the way the deals were set up, as I understand them, and please correct me or straighten me out, there were payments essentially coming into the system through a counterparty. The way the contract was set up was that Bridger would be eligible to receive payments from the counterparty, which was Jamex. But our argument is that, and the district court thought the payments were an adequate substitute for disclosure of non-delivery of oil, were. Our argument is that Bridger's cessation of all oil deliveries under its most important contract is an independently material fact that bears directly upon the company's future, that would have allowed reasonable investors to make a more informed assessment of their investment decision. Wasn't there a 10-Q filed that very day, though? Yes, Your Honor. What does that say? Well, it's an interesting question. So the one sentence in the 10-Q appears that J.A. 281, and what it says is that Jamex owed Bridger $19.4 million as of April 30th, 2016. Now, again, it was filed in June. So it doesn't speak to the present, and it doesn't It also said it may not have the financial resources sufficient to satisfy its payment obligations. It did say that about Jamex. But let me get back to the first question, if I may. That single line, if it had adequately informed investors that Bridger was no longer delivering oil, the very first question by a sophisticated RBC analyst on that call would not have been, are you delivering oil? What's the outlook for the future? Now, they did make a disclosure that Jamex may not be able to meet its financial obligations. Tell me what RBC stands for. Royal Bank of Canada. It's just a securities analyst. I guess my position is that's a more I often refer to myself as acrophobic because acronyms can drive me crazy. This is the wrong case for you, Your Honor. There are a lot of acronyms here. So many of them are. Just don't ask me what any more of them mean, please. But in any event, they said Jamex may not be able to, two things, fulfill its financial obligations to Bridger. And we allege that by that time, Bridger, which looked to Jamex as its so-called bulwark, its mainstay against a downturn in oil prices, they knew they had inadequate financial resources to make those payments. And the statement, Your Honor, in the June 10 queue was made just one month before the Jamex obligations. And we argue under Your Honor's MF Global decision and also the JNCO Solar decision that it's reasonable to infer from that one-month distance between the July, the company admitting that it knew Jamex had inadequate financial resources in July and the June 10 queue, you can infer that those financial circumstances were inadequate just that one month earlier. But we don't rely solely upon that because what defendants have absolutely no adequate explanation for here is the fire sale of BTS, which is the Bridger subsidiary that contracted with Eddystone to offload oil from rail cars onto a barge to be shipped downriver to Monroe. When the oil prices changed and Bridger, in a fire sale, sold off BTS for $10. So they no longer had a means to transport oil to Monroe, even if Monroe wanted the oil. They broke the supply chain by doing that. And why did they do that? They did that because the bulwark didn't have adequate resources to pay its own deficiency payments to Bridger. And how do we know that? If we look at page 37 of defendant's brief, it says, if Jamex had had adequate resources to make its deficiency payments to Bridger, those would have offset BTS's deficiency payments to Eddystone. Well, why would you evaporate a subsidiary of a publicly traded company for $10 but for the inability to have those deficiency payments offset by Jamex? We also allege other circumstantial evidence. I think one of the problems we had with the district court's SIENTRA analysis as to Jamex's financial condition is he seemed to demand the proverbial smoking gun that TELAB says is not required. He said, you don't plead any evidence, document, or email. But under this court's 2001 decision in Scholastic, it was made clear that SIENTRA allegations under the PSLRA do not require detailed pleading of evidence. So that is a long-winded answer to a question about Jamex's financial circumstances. But I want to say that Jamex's financial circumstances, other than that one representation, Your Honor, in the queue that you pointed to, only matter if you accept the notion that an oil delivery company's failure to deliver oil under its most important contract is immaterial to investors. What are the specific allegations as to SIENTRA that they knew Jamex was failing? The specific allegations, other than the ones that I just mentioned, are that— Sorry. In doing that, could you just sort of quickly marshal 1, 2, 3, 4? Yes. Because I'm very interested in the answer to that. Right. So, temporally, one. Well, first of all, at the time of the acquisition, Defendant Rios and Ballingee, who ran Jamex, were longstanding business partners. And Jamex became a related party based on its receipt of 9.5 percent of ferrogas in that acquisition. Two, in the fall of 2015, Jamex came to Bridger saying that—and we allege this in the complaint—that they didn't have adequate resources to fund the deficiency payments to Bridger. Three, we talked about the fire sale of BTS and how you can infer from that that when it realized it couldn't make deficiency payments to Bridger, so they offloaded BTS so that BTS wouldn't owe $3.4 million a month to Eddystone that would not be offset by Jamex's deficiency payments. But let me suggest that Jamex's financial circumstances only matter, again, if you assume that the non-delivery of oil by an oil delivery company under its most important contract is immaterial. Because Defendant's statements on June 8th are otherwise materially misleading for failing to disclose Bridger's secret agreement to stop delivering all oil under its most important contract. That's the one statement? That's all you need to show? Well, right. For the purpose of remand, we only need to show one statement, but there were numerous statements during that call that were materially misleading for precisely the same reason. You've reserved two minutes for rebuttal, Mr. Whitman. Thank you. Thank you, Your Honor. Ms. Sherry? Good morning, Your Honors. May it please the Court. To start with Your Honor's question, the critical flaw in Plaintiff's case, and it's the one that the District Court pointed out time and again and what became a mantra in this case, is that their allegations do rest on the assertion that Jamex was unable to make its deficiency payments and that Defendants knew of that fact. But you can search the complaint in vain to find a single fact in the complaint to support that assertion. There's no facts in the complaint that show that they were unable to make the deficiency payments at any relevant point in time, much less any facts to show that the Defendants knew they were unable to make those payments. And I think it's important to look at the timing here to jump to the June disclosures. In June, the barrel of gas told the market, first of all, Jamex owes about $19 million in deficiency payments, that's in the 10-Q, told the market that they may not be able to make those payments, told the market that they may not be able to fulfill their obligations under the COSA, that they were in the process, Bridger was in the process of trying to negotiate alternative contractual arrangements, and if that all didn't work out, that could have a materially adverse effect on Bridger. So this is all disclosed to the market on June 8th at the very same time the statements are made during the conference call. Now what plaintiffs want this Court to infer is that the market, despite all of those disclosures, thought in response to what was said during the conference call that, sure, they're still delivering a ton of oil, everything is all fine and well. It's not the rosy picture that they painted in June, and the market knew that they weren't delivering a lot of oil because, again, they disclosed the fact that there were $19 million in outstanding deficiency payments as of the end of April 30th. In the briefs, it points out that I think it's $14.2 million are the deficiency payments that are owed if zero oil is being delivered. So the mere fact that $19 million was owed told the market that either no oil was being delivered or very, very little oil was being delivered at that time, and that's what the market understood. If you look in the joint appendix, the RBC analyst report, which is on the very last page of the joint appendix, it's page 315, he said, based on everything we know, it looks like not much of any oil is being delivered. So that wasn't a surprise to anyone in the market at that time. So those... Speaking of mantras, they kept repeating the mantra that we're completely insulated from commodity price drops, even up to that time. Was that true? It was true, if you understand what they meant by it. So dependent on commodity prices is the language that gets repeated throughout the class period, until the end. And what that meant is it was describing their business model. They're a midstream company that doesn't take commodity risks, unlike other midstream companies. And so if you look all the way going back to the beginning of the class period, when they say that, they explain what they mean by it. They're in the middle of the supply chain. They have these fee-based contracts, which means they get paid per barrel of oil, regardless of what the price of oil is. And they have these take-or-pay contracts that insulate them, you know, if the oil is not flowing. And so... They don't have an interest in the oil itself. So if the price of the oil goes up or down, it's counteracted by the payments from one side or the other. And that's... They meant no more than that? Is that... That's exactly right. And interestingly, you know, in the district court, they challenged 23 different statements. They only raised eight on appeal. If you look at some of the ones they dropped, they explain exactly that to the market. For example, if you go back to June 1st, 2015, and look at Statement 1, and this is in... If you look at the district court's opinion, it's Special Appendix 3 to 4 is where these are coming from. So if you look at Statement 1, it explains what they mean by not dependent on commodity prices. If you look... Another one is Statement 6, and that's on September 2015. It explains much the same thing. You go to December 2015, this is Statement 9. It explains that this is because they are fee-based contracts, and because these are take-or-pay contracts. And so throughout the class period, they're telling the market the same thing. They're describing the type of midstream company that they are, that unlike their counterparties who clearly do take commodity risk, that they don't. So again, it all ends up circling back to Jamex's ability to pay. And unlike the cases that plaintiffs rely on, we're not talking about information that is within the company itself, within Bridger. We're talking about the financial condition of a different company, of a contractual counterparty. And I think in listing the different bases for Scienter that my colleague pointed to, I think he said something about the defendants having knowledge that Jamex somehow told Bridger that it was not going to be able to make the deficiency payments. I don't know what paragraph in the complaint that is, but it's not one that I have seen. Again, as the district court found, as Judge Sullivan explained, you can look throughout the complaint, finding a factual allegation showing that the defendants knew the financial condition of another company at any given point in time is completely missing. And- Other than that they weren't making payments. So, well, exactly, except there's no allegations that Rios or Wamboldt knew that they weren't making any payments at any given point in time. And there's really only three time periods that are now relevant based on this statement. So there's December, one of the statements, statement eight is in December. That's before the COSA was suspended, that was before any of the side letters were entered into. The oil is still flowing, there's no allegations that deficiency payments were owed or not made at that time. Then all the June ones that we were talking about at that point, they told the market exactly that. We haven't been paid $19 million, we don't know if it's going to get paid in the future. And then the only other statement that falls in between those two dates is the March statement. And that was made on March 10th, that was about a month and a little over a week after the side letters went into effect, after the oil stopped flowing. So what deficiency payments exactly were owed at that point, whether they were made, how much was made, and especially what that meant for the long-term ability to pay, and whether any of the defendants knew of those facts at the time is completely absent from the complaint. That's what the district court says at page 16 of the special appendix with respect to the March statements in particular. And so I think if you look at the briefs, it said, I think, in quite a few places that not a single deficiency payment was made. I followed those citations and what's cited at all those different statements around. I can't find the paragraph in the complaint that actually alleges that, let alone alleges that with facts underlying it. And finally, the BTS sale, which is obviously a huge focal point of plaintiff's argument. I think it misunderstands a couple of different things. Number one, and we point this out in our brief, their initial argument in their brief was that this was a big deal because it was going to put Bridger out $3.41 million even if Jamex made its payments. As we pointed out in our response, that's not at all true. I mean, ERC wasn't transporting the oil for free. So under the contract, either we were paying them to transport the oil or we were paying them the deficiency payment. It wasn't an additional cost to Bridger. So that is sort of off the table at this point. The idea that it blows it up so there can't be any long term oil transportation also doesn't work. Jamex is a related counterparty, a contractual counterparty. And so if the oil prices go back to where they were and oil starts being shipped again, there still is this relationship with ERC. It's under Jamex's corporate family instead of Feral Gas's corporate family, but it's in the same family. Everything can go back to business as usual. And so I think that doesn't work as well. And the third point with respect to the BTSL is, well, that just, I guess, made it harder for Jamex to make the deficiency payments or showed somehow we knew they weren't going to make the deficiency payments. But that kind of gets us all back to where we started. It's all about Jamex's inability to pay and what the defendants knew with respect to that and when they knew that. And that's what's missing from this complaint. We'd ask the court to affirm. Thank you, Ms. Sherry. Mr. Whitman, you've reserved some time for rebuttal. Thank you, Your Honors. This case is not all about Jamex's financial condition. The first statement that I began discussing on June 8th where Defendant Rios misrepresented that Bridger was delivering oil. It has nothing to do with Jamex's financial condition. His statements that Bridger was operating within its contracts with Monroe, which he said three times during the same conference call in response to the same analyst question asking about oil deliveries on the day the 10Q was filed that supposedly told everybody they weren't delivering oil, do not depend upon Jamex's financial condition. The statement in the 10Q on June 8th that Jamex may not be able to fulfill its crude oil volume sourcing commitments doesn't depend on Jamex's financial condition and it's absolutely false because at the time of that statement, Jamex had no sourcing commitments pursuant to the side letters. So I urge that we do not focus so much on Jamex's financial condition and looking at whether these statements were appropriately dismissed because the basis for them was that apparently it's not material that an oil delivery company isn't delivering oil under its most important contract. That flies in the face of established law in this circuit about what is a material fact. In Judge Stroni, you were on a panel that issued the Nomura decision, which said materiality cast a sufficiently wide net to encompass every fact that would significantly alter the total mix of available information. If an oil deliveries company failure to deliver oil under its most important contract to which it dedicated 1,394 rail cars isn't within that net, it's hard to imagine precisely what is. With regard to my colleague's inability to spot certain allegations about when Jamex approached Bridger with financing problems, that's in paragraph 96 and 142 of the complaint. And finally, the materiality of non-delivery of oil, again, is established not only by the first analyst question, but also by the 29% decline in the price of ferro gas units on September 28th when they first disclosed that they hadn't delivered a single drop of oil since February 1st. Thank you, your honors. Thank you. Thank you, Mr. Whitman. Thank you, Ms. Sherry. We'll reserve decision in this case.